**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Joshua Otey, being first duly sworn, hereby depose and state as follows:

1. I am a Special Agent with Homeland Security Investigations, Department of Homeland Security ("HSI"), and am currently assigned to HSI's Burlington Office. I have been a Special Agent with HSI since March 2020. As part of my duties, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt, and possession of child pornography, in violation of Title 18, United States Code, Sections 2251, 2252, and 2252A. I have participated in a number of investigations into the receipt, possession, and/or distribution of child pornography by electronic means. I have gained expertise in these areas through training and daily work conducting these types of investigations. I also have experience executing search warrants, including search warrants for physical premises and electronic evidence.

2. I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below, further described in Attachment A, for the items and information described in Attachment B. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of computers and electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

1

**The Premises to be Searched**

3. The premises to be searched (the "Subject Premises") is 673 Border Road, Alburgh, Vermont. The Subject Premises is a single-family residence, detached garage, and outbuilding structures located on the property of 673 Border Road, Alburgh, Vermont with an address marker affixed to the mailbox at the driveway. The Subject Premises is described in more detail in Attachment A.

**The Subject Offenses**

4. For the reasons detailed below, I submit that there is probable cause to believe that the Subject Premises contains evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 2251 (production of child pornography), 2252(a)(2) & 2252A(a)(2) (distribution of child pornography), and 2252(a)(4) & 2252A(a)(5) (possession of child pornography) (collectively, the "Subject Offenses"), as described in Attachment B.

**Terminology**

5. As used herein, the following terms have the following meaning:

    a. Child Pornography: defined in Title 18, United States Code, Section 2256(8) in pertinent part as "any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where . . . the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct . . . ."

    b. Computer: includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, server computers, and network hardware, as well as wireless routers and other hardware involved in network and Internet data transfer.

    c. Computer hardware: all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices) and peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well

2

as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

    d.  Computer software: digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

    e.  Computer Data/ESI (Electronically Stored Information): consistent with Fed. R. Crim. P. 41 and the Advisory Committee Comments to the 2009 amendments, ESI includes writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations stored in any medium from which information can be obtained, including all types of computer-based information as may be developed over time. "Computer data" as used herein is synonymous with ESI.

    f.  Computer Passwords, Pass-Phrases, and Data Security Devices: as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password or pass-phrase (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

    g.  Directory or Folder: a simulated electronic file folder or container used to organize files and directories in a hierarchical or tree-like structure.

    h.  File: a collection of related data or information stored as a unit under a specified name on storage medium. Not all ESI is stored in files.

    i.  File Extension: many operating systems allow a filename extension that consists of one or more characters following the proper filename. For example, image files are frequently stored as .bmp, .gif, .jpg, or .tiff; audio files commonly come in a variety of formats such as .aud, .wav, or .mp3. The filename extension should indicate the file type or format; however, users may change filename extensions to evade firewall restrictions or for other reasons. Accordingly, file types must be identified at a binary level or by viewing the contents of the file, rather than by relying on file extensions alone.

    j.  Forensic Copy/Image Copy: a data compilation created with the use of forensic software that contains an exact copy, sometimes referred to as a bit-by-bit copy, of an entire physical storage medium (hard drive, smart phone, DVD, tape, etc.), including all active and residual data and unallocated or slack space on the media. Forensic copies are sometimes called "images" or "imaged copies" or "mirror images." Forensic copies are generally only reviewable via forensic review software (meaning that user files contained within a forensic copy

cannot simply be opened with the program originally used to create them). User files can, as useful, be extracted from forensic copies for ease of review; but review of latent or residual data, where needed, must generally take place via forensic review software.

k.  Internet: a global network of computers and other devices that communicate with each other. It supports services such as email, the World Wide Web, file transfer, and Internet Relay Chat. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when devices communicating with each other are in the same state.

l.  Internet Protocol address ("IP Address"): a unique numeric address used to identify a particular computer connected to the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static — that is, long-term — IP addresses, while other computers have dynamic — that is, frequently changed — IP addresses.

m.  Latent/Residual Data: deleted files and other ESI that are inaccessible without specialized forensic tools and techniques. Until overwritten, this data resides on media such as a hard drives in unused space and other areas available for data storage. It can include data within files that has functionally been "deleted" in that it is not visible using the application with which the file was created absent use of undelete or special data recovery techniques.

n.  Metadata: data that describes characteristics of other ESI, for example, how, when, and by whom that ESI was collected, created, accessed, modified, and formatted. Metadata can be found in different places in different forms; it can be created by applications, users, or the file system; and can be altered intentionally or inadvertently. Some metadata, such as file dates and sizes, may be easily accessible; other metadata can be hidden or embedded and unavailable without technical skill and tools.

o.  Records, documents, and materials: include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks ("DVDs"), Personal Digital Assistants ("PDAs"), Multi Media Cards ("MMCs"), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, Bernoulli drives, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

4

p.   Slack Space: space within a cluster (unit of storage space for a file) that is not being used for storage of the file, but which may contain latent or residual data relating to the file or to other activity on the computer.

q.   Storage Medium, ESI Storage Device, ESI Storage Media, Electronic Storage Media: any device or physical object capable of storing ESI, including computers, optical disks such as CDs and DVDs, RAM (random access memory), floppy disks, flash memory, thumb or flash or USB drives, tapes and cartridges, and other magnetic or optical media.

r.   User File: a file generated by a user, generally by using a program or application such as a word processor or photo editor, as distinct from files constituting, or generated by, the system or program.

s.   "Minor," "Sexually Explicit Conduct" and "Visual Depiction": are defined as set forth in Title 18, United States Code, Section 2256.

**Probable Cause**

6.   HSI Offices throughout the United States and abroad have ongoing investigations to identify victims of child sexual abuse ("CSE") on the darkweb and other internet sites, as well as to locate those individuals committing such crimes against children. HSI works to accomplish this mission by infiltrating and dismantling criminal organizations that operate CSE forums and chat sites through the internet. Additionally, HSI works and coordinates with law enforcement partners both domestically and internationally to achieve these goals. HSI seeks to identify the individuals committing these crimes on the internet.

7.   Based on my training, experience, and conversation with other law enforcement officers I know that the website involved in this investigation https://imgsrc.ru (the "Subject Website"), is an "image board," an anonymized web forum that allows users to post photos and comment on them. The Subject Website is known to law enforcement as a platform used primarily by subjects having a sexual interest in children to communicate and exchange child sexual abuse material with one another. Law enforcement in Russia have the ability to obtain

5

information from the website host, as was done in this investigation, and have provided information associated with the website to other law enforcement authorities.[1]

8. In or about October 2023, the user of screenname "LICKIT1964" (the "User") made a post on the Subject Website that was seen by an undercover Queensland, Australia Police Task Force Detective Sergeant (the "Undercover") who recognized the post to be indicative of the possible sexual abuse of a minor. Specifically, the User wanted to exchange pictures of daughters or step-daughters, and the User posted photographs of a minor female consistent with a sexual interest in children.

9. In or about October 2023, the Undercover made a comment to the User, who subsequently contacted the Undercover directly by e-mail using the e-mail address "buckinheat64@yahoo.com" (the "Subject E-mail"). The Undercover and the User then exchanged emails between on or about October 13, 2023, and on or about October 30, 2023. After the Undercover received a final email on October 30, 2023, the Subject E-mail became unreachable. It is believed that the account was disabled.

10. During the e-mail exchanges, the User, using the Subject E-mail, made the following statements, in sum and substance:

   a. The User has access to a 16-year-old (referred to herein as Minor Victim 1 or "MV1").

   b. The User has a sexual interest in MV1. The User has "pushed boundaries" with MV1, and indicated that MV1 did not respond negatively. The User and MV1 grab each other on the butt. The User would love to "go down" on MV1 but is nervous about it.

---

[1] Based on my training and experience, I know that the ".ru" in the web address of the Subject Website stands for Russia, meaning it is a website housed in Russia.

6

1. Based on the conversation, I believe the User is referring to his desire to touch MV1's genitalia with the User's mouth.

c. The User loves filming MV1 in the bathroom using a hidden camera. The User suggested to the Undercover that they exchange pictures.

11. The User distributed a total of (4) four media files to the Undercover via the Subject E-mail, which consisted of three (3) images and one (1) video. I have reviewed these media files and describe them below. I have also seen photographs of MV1, and I recognize her to be the female depicted in these media files. I also know that she was born in 2007, and is now 16 years old.

12. On or about October 23, 2023, the User sent a photograph (IMG_8578.jpeg) from the Subject E-mail as an attachment to the Undercover. The User referenced the image in the body of the e-mail and wrote, in substance and in part, "I love filming her in the bathroom with a covert camera...I attached a screenshot from a video."

a. IMG_8578.jpeg depicts MV1 in a bathroom with a hanging shower curtain seen in the background. MV1 appears to be drying herself with a towel while another towel is wrapped around her hair. MV1's breasts and vagina are exposed and visible to the camera.

b. Based on my training and experience, I believe that this image constitutes CSAM.

13. On or about October 23, 2023, the User sent two (2) photographs depicting MV1, IMG_8586.jpeg and IMG_8591.jpeg, to the Undercover from the Subject E-mail. The User wrote in the body of the email, "a couple more pix."

7

    a.  IMG_8586.jpeg shows MV1 seated on a couch next to a dog. MV1 is wearing what appears to be shorts and a sweatshirt. MV1's legs are bent at the knee with her feet on the edge of the couch cushion. Her legs spread apart as her attention is focused on her thigh. It is unclear if MV1 is holding an object that demands her focus. EXIF data reviewed by the Queensland Task Force revealed the image was created on October 19, 2023, 20:32:51 with an Apple iPhone 13Pro.

    b.  IMG_8591.jpeg shows MV1 lying on a couch. The focus of the picture is centered on the torso and hip area of MV1, whose face is not visible. This image appears to have been taken shortly after IMG_8586.jpeg. EXIF data reviewed by the Queensland Task Force revealed the image was created on October 19, 2023, 21:05:37 with an Apple iPhone 13Pro.

  14.  On October 30, 2023, the User sent a video file, GH010070.mov, to the Undercover from the Subject E-mail as an attachment to an e-mail. The body of the User's email read: "short clip."

    a.  GH010070.mov is approximately 5 seconds in length and shows MV1 in the bathroom. It appears that this video is the one from which the User took a screenshot and created IMG_8578.jpeg, referenced above in paragraph 12(a). During the video MV1's genitalia and breast are exposed to the camera.

    b.  Based on my training and experience, I believe that GH010070.mov constitutes CSAM.

  15.  Queensland Task Force law enforcement officials obtained subscriber information and internet protocol (IP) log information from the Subject Website for the User LICKIT1964. The email address "brianbluto@gmail.com" was associated with the profile. Records obtained

8

from the Subject Website revealed the following accounts that were related by IP address, username similarity, and/or e-mail address:

    a.    Linked by same IP and similar name:

        i.    Username:    lickit64

        ii.    email:    hidden / buckinheat@yahoo.com[2]

        iii.    Joined:    2020-10-14

    b.    Linked by same IP and similar name:

        i.    Username:    1964mrbee

        ii.    email:    briancbluto@lsvls.com

        iii.    Banned:    2020-07-28 22:37:39 child porn distribution

        iv.    Joined:    2019-12-10

    c.    Linked by email address used to communicate with the Undercover;

        i.    Username:    mrbee1964

        ii.    email:    buckinheat64@yahoo.com

        iii.    Banned:    2020-08-26 19:38:06 for reposts / copyright issues

        iv.    Joined:    2018-08-19

16.    IP address information obtained from the Subject Website included the IP addresses 71.181.126.83 and 69.50.63.48 utilized between September 19, 2023, and October 9, 2023. A query of the American Registry of Internet Numbers revealed the IP addresses were associated with Consolidated Communications. I served an administrative subpoena upon Consolidated Communications for subscriber records of the account utilizing the IP addresses on

---

[2] A "hidden" e-mail means that the user chose not to make the e-mail address publicly available on their profile.

the specified date and time of the usage log. On December 11, 2023, Consolidated Communications provided subscriber records which established that the IP addresses were assigned to the account of Barbara and Brian Bluto with a listed address of the Subject Premises between September 19, 2023 through October 9, 2023.

17. I conducted an internet search of the domain "www.lsvls.com," as noted in the email address briancbluto@lsvls.com, and discovered the website www.vermontlifesafety.com. The "our team" section of the company website lists Brian C. Bluto as "VP of Service," and describes his role as follows:

> Operations Manager of the northern office in Bolton, Vermont. Brian has been with VLS since its inception providing expert electronics service throughout the northeast. In addition to his encyclopedic knowledge of security and alarm systems, Brian is an avid sportsman and race fan.

18. I conducted a google search of the Subject E-mail (buckinheat64@yahoo.com), which returned a result for the website https://imgsrc.ru/lickit1964. Google had indexed information for the site, although it had been disabled and was no longer active. The indexed information included "Anyone want to trade daughter or stepdaughter pictures? buckinheat64@yahoo.com."

19. A query of Vermont Law Enforcement records revealed that Brian Bluto resides at 673 Border Road, Alburgh, Vermont (the Subject Premises). His date of birth is XX/XX/1964. Username LICKIT1964 includes Bluto's birth year, as does the Subject E-Mail.

20. A query of the Vermont Department of Motor Vehicles ("DMV") database revealed that Bluto listed his current address as the Subject Premises. Vermont DMV records also included registration for a 2020 red Dodge Ram pickup truck in the name of Brian Bluto at the Subject Premises.

21. An inquiry of the Subject Premises address revealed that an in-home childcare facility was operated at the Subject Premises. I conducted a google search of the in-home childcare facility, and it appears that it is still operational.

22. On December 10, 2023, I conducted surveillance at the Subject Premises. I observed a red colored Dodge truck parked in the driveway. Due to the distance, weather, and lighting, I was unable to confirm the registration plate. I also observed a white panel-style van with a red background square shaped decal on the rear passenger side of the vehicle. There was a ladder mounted to the roof of the white van. Due to the distance, weather, and lighting at the time of observation, I was unable to read the decal or registration plate. A google search of vehicles utilized by Vermont Life Safety company (Bluto's employer) returned a photograph of white panel style vans with roof mounted ladder and a visually similar square decal with a red background.

23. Based on my training, experience, and conversations that I have had with federal agents and other law enforcement officers, I know the following:

    a. Child pornography is not readily available in retail establishments. Accordingly, individuals who wish to obtain child pornography usually do so by ordering it from abroad or through discreet contacts, including through the use of the Internet, with other individuals who have it available or by accessing web sites containing child pornography. Child pornography collectors often send and receive electronic communications conversing with other collectors in order to solicit and receive child pornography.

    b. I know that people who collect and trade child pornography typically do not destroy or delete image files or video files depicting child pornography. Instead, collectors of child pornography typically retain their materials and related information for many years, and

11

sometimes indefinitely. Even when files are deleted from a computer, they can frequently be recovered during a forensic examination.

      c.      Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. Such individuals in possession of files containing child pornography are likely to save and maintain these files on their computers or other portable storage devices so they are readily accessible in their home, office, or vehicle.

      d.      Because of the illegality and the significant social stigma child pornography images carry, collectors hide them in secure places. These secure physical places often include physical places such as the home or other structures on the property where the individual resides. These secure physical places can also include secure electronic places such as hidden files on the hard drives of the individual's computers and external storage media, including but not limited to cellular phones or thumb drives.

      e.      I also know that collectors of child pornography often maintain lists of names, addresses, telephone numbers, and screen names of individuals with whom they have been in contact and who share the same interests in child pornography.

      f.      I am also aware that an individual who possesses more than one computer or smart phone may send a file containing child pornography from one phone to another phone or from one laptop to another in order to maintain, preserve, and/or hide the file.

24.      In light of the foregoing, information in support of probable cause in child pornography cases is unlikely to be stale because collectors and traders of child pornography are known to store and retain their collections and correspondence with other collectors and distributors for extended periods of time.

25. Based on my training and experience, I know that persons who collect and distribute child pornography frequently collect and view sexually explicit materials in a variety of media, such as photographs, magazines, motion pictures, video tapes, books, slides and/or drawings or other visual media that they use for their own sexual arousal and gratification. These examples of visual media containing sexually explicit materials are often times stored on various devices, including but not limited to, computers, disk drives, modems, thumb drives, personal digital assistants, mobile phones and smart phones, digital cameras, and scanners, and the data within the aforesaid objects relating to said materials.

26. Based on the foregoing, I respectfully submit that there is probable cause to believe that Bluto is the User, that Bluto lives at the Subject Premises, and that evidence related to the commission of the Subject Offenses, detailed in Attachment B, will be found at the Subject Premises.

27. Individuals who engage in the criminal activity described herein, in the event that they change computers, will often back up or transfer files from their old computers' hard drives to that of their new computers so as not to lose data, which would be valuable in facilitating their criminal activity. In addition, individuals who engage in such criminal activity will often also store or transfer files on electronic storage media other than computer hard drives, including thumb drives, flash memory cards, CD-ROMs, or portable hard drives to, for example, facilitate the use of the information or to transfer it to co-conspirators in support of the criminal scheme.

28. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files can be stored on a hard drive for years at little or no cost. Even when such files have been deleted, they can often be recovered, depending on how the hard drive has

subsequently been used, months or years later with forensics tools. Specifically, when a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Deleted files, or remnants of deleted files, may accordingly reside in "slack space" for long periods of time before they are overwritten. In addition, a computer's operating system may keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are generally automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

29. Based on the foregoing, I respectfully submit there is probable cause to believe that evidence of BLUTO's commission of the Subject Offenses is likely to be found in electronically stored information ("ESI") recovered from the Subject Premises.

**Procedures for Searching ESI**

30. Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

14

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

31.    The seized devices may include smartphones that offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") or facial recognition in lieu of a numeric or alphanumeric passcode or password. For Apple devices, for example, this feature is called Touch ID or Face ID, depending on the model of the Apple device.

32.    If a user enables Touch ID on a given Apple device, he or she can register up to five fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. Similarly, Face ID allows a user to unlock the iPhone X and later models. It provides intuitive and secure authentication enabled by the TrueDepth camera system, which uses advanced technologies to accurately map the geometry of the user's face. Face ID confirms attention by detecting the direction of the user's gaze, then uses neural networks for matching and anti-spoofing so the user can unlock the phone with a

15

glance. Face ID automatically adapts to changes in the user's appearance, and carefully safeguards the privacy and security of the user's biometric data.

33. In my training and experience, users of mobile devices that offer security technology like Touch ID and Face ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

34. In some circumstances, a fingerprint cannot be used to unlock a device that has security technology like Touch ID enabled, and a passcode or password must be used instead. These circumstances may include: (1) the device has been turned off or restarted; (2) the device has received a remote lock command; (3) five unsuccessful attempts to unlock the device via Touch ID are made; (4) when more than 48 hours has passed since the last time the device was unlocked; and (5) when the device has not been unlocked via Touch ID in eight hours and the passcode or password has not been entered in the last six days.

35. Similarly, in some circumstances, the user's face cannot be used to unlock a device that has security technology like Face ID enabled, and a passcode or password must be used instead. These circumstances may include: (1) the device has just been turned on or restarted; (2) the device has not been unlocked for more than 48 hours; (3) the passcode has not been used to unlock the device in the last 156 hours (six and a half days) and Face ID has not unlocked the device in the last four hours; (4) the device has received a remote lock command; (5) after five unsuccessful attempts to match a face; (6) after initiating power off/Emergency SOS by pressing and holding either volume button and the side button simultaneously for two

seconds. Thus, in the event law enforcement encounters a locked mobile device, the opportunity to unlock the device via fingerprint or face recognition exists only for a short time.

36. The passcodes or passwords that would unlock any smartphones seized in connection with this warrant are not known to law enforcement. Thus, it may be necessary to press the BLUTO's fingers to any smartphones seized in connection with this warrant in an attempt to unlock the device(s) for the purpose of executing the search authorized by the warrant sought by this Affidavit. Similarly, it may be necessary to have BLUTO remain still and look, with eyes open, at the camera of any smartphones seized in connection with this warrant in an attempt to unlock the device(s) for the purpose of executing the search authorized by this warrant. Attempting to unlock any smartphones seized in connection with this warrant with the use of BLUTO's fingerprints or face may be necessary because the Government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by the warrant being sought.

37. Although I do not know whether any smartphones will be seized in connection with this warrant, or whether any fingerprints of anyone found in the Subject Premises will be capable of unlocking any of such devices, based on my training and experience I know that it is common for users to unlock their devices via the prints on their thumbs or index fingers. In the event that law enforcement is unable to unlock any smartphones seized in connection with this warrant within the number of attempts permitted by the devices' security features, this will simply result in the devices requiring the entry of a password or passcode before they can be unlocked.

38. I therefore request that the Court authorize law enforcement to press the fingers, including thumbs, of Bluto to any smartphones seized in connection with this warrant, or to

17

instruct Bluto to remain still, with eyes looking forward at the camera of any smartphones seized in connection with this warrant, for the purpose of attempting to unlock the devices in order to search the contents as authorized by the warrant sought by this Affidavit.

**Conclusion**

39. Based on the foregoing, I respectfully request the court to issue a warrant to search the Subject Premises, described in Attachment A, and to seize and search the items described in Attachment B.

JOSHUA OTEY
Special Agent
Homeland Security Investigations

Sworn to and subscribed before me this /2th day of December ___, 2023

HON. KEVIN DOYLE
United States Magistrate Judge